ANTOINETTE BIBBO, as Administratrix, etc., of ALFRED A. BIBBO, Deceased, Plaintiff, *v.* THE PENN MUTUAL LIFE INSURANCE COMPANY, Defendant.

First Department, June 8, 1934.

*Ludwig Mandel* of counsel [*Maurice Danson* with him on the brief; *Maurice Danson,* attorney], for the plaintiff.

*Francis O. Affeld, 3d,* of counsel [*Allen T. Klots* with him on the brief; *Winthrop, Stimson, Putnam & Roberts,* attorneys], for the defendant.

MERRELL, J. The plaintiff, Antoinette Bibbo, as administratrix of the goods, chattels and credits of Alfred A. Bibbo, deceased, makes claim against the defendant, The Penn Mutual Life Insurance Company, for the sum of $2,897.64, representing the face amount of a policy of life insurance for $3,000 issued by the defendant upon the life of plaintiff's intestate on March 17, 1930, the face of the policy being reduced by the amount of an outstanding loan thereon made by the defendant to the assured, amounting to the sum of $102.36.

Alfred A. Bibbo, the deceased, was the husband of the plaintiff. He died on April 11, 1933, a resident of the county, city and State of New York. Under the terms of the policy, payment, in case of death of the assured, was to be made to his executors, administrators or assigns. The policy was not assigned, and all premiums due thereon had been paid at the time of the death of the assured. The policy provided that the full reserve on any paid-up insurance or extended insurance, less any indebtedness thereon, would be available at any time upon proper release and delivery of the policy. The policy further provided that " The Company shall have the right to defer the payment of any surrender value of this Policy (unless for the purpose of paying premiums on policies in this Company) for a period of not exceeding ninety (90) days from the date of the application therefor."

The assured had borrowed on the policy, and there was outstanding at the time of his death as a loan against said policy the sum of $96.57, with accrued interest in the sum of $5.79, making a total charge on the policy, at the time of the assured's death, of $102.36.

It is stipulated by the parties that on March 17, 1933, the assured delivered to the defendant at its office in the city of New York a letter requesting the cash surrender value of said policy. The letter of the assured in this respect is as follows:

" NEW YORK, *March* 16*th*, 1933.
" PENN MUTUAL LIFE INSURANCE CO —

" Dear Sir: I am forced to surrender my insurance policy with your Company on account of being made a part to a separation suit instituted by my wife and I am order by Court to pay lawyers fees to the amount of $125.00.

"As the day of trial is approaching (and I have to have by that morning $62.50) I need sorely the money, otherwise I will be held in contempt of Court, and go to jail.

" My earnings are very low as I work on commission three days a week as barber.

" I am sure that you can do something for me, as I intend to take more insurance, as soon as I am through with this separation suit, and start life anew —

" Yours very truly<br>"ALFRED A. BIBBO."

On March 29, 1933, the assured delivered to the defendant, at its office in the city of New York, the said policy, accompanied with the following letter addressed to the defendant and signed by the assured:

" New York, <i>March 29th</i>, 1933.

" United Trift [<i>sic</i>] Plan Inc.
  122 E. 42. N. Y. C.
    Re — #16164 —

" Dear Mr. Strauss: Enclose you will find form, which was sent me in your letter of this morning, properly signed by me & two witnesses —

" I do sincerely trust that you will give this matter immediate attention on account of urgency and nearness of separation trial — I will never forget your & Mr. Pearlman courtesy and attention you have both shown me.

" Cordially yours<br>"ALFRED A. BIBBO."

Accompanying said last mentioned letter was a form, supplied by the company, duly signed and executed by the assured in the city and State of New York, in the following form:

" Cash Surrender<br>" Policy No. 1,493,770

" in the Penn Mutual Life Insurance Company, of Philadelphia, Pennsylvania, on the life of Alfred A. Bibbo

" If this instrument is executed only by the insured, then the beneficiary under this Policy is hereby changed to the Insured's executors, administrators or assigns (if the right to do so is reserved to the Insured alone).

" I hereby surrender and assign all Right, Title and Interest in the above Policy to The Penn Mutual Life Insurance Company, of Philadelphia, Pa., in consideration of receiving from the· said Company:

" 1. The cancellation of the outstanding premium note for $ with adjustment of interest.

" 2. The cancellation of the outstanding loan note for $96.57 with adjustment of interest.

" 3. The cancellation of the promissory note given for the annual premium due                               with interest.

" 4. $78.66

" Signature to this instrument is a warranty that the undersigned is the sole and absolute owner of the above policy, and that no proceedings in bankruptcy are pending against the undersigned.

" Witness my hand and seal at NYC State of NY this 29th day of March, 1933.

" Witnesses present:

" 1    PETER JUNG

" 2    THOMAS BORRITO

"ALFRED A. BIBBO    [SEAL]

.....................    [SEAL]

.....................    [SEAL]

.....................    [SEAL]

.....................    [SEAL]

" DATE this transfer, sign as indicated, and have two witnesses to each signature (the same two persons may repeat as witnesses to any number of signatures).

" Noted

" N. C. BAUER,

" For Actuary.

" CHAS. A. WOOD

" am Secretary.

"ALL PAPERS MUST BE SIGNED IN INK, PENCIL SIGNATURES CANNOT BE ACCEPTED."

It is agreed between the parties that the cash surrender value on the policy, payable to the assured at the date of the delivery of the policy, together with the signed form last above referred to, and at the date of the assured's death, was $181.02, from which amount there was deductible the aforesaid outstanding loan in the sum of $102.36, leaving a net cash surrender value on the policy of $78.66. The defendant did not tender to the assured or pay to him, prior to his death, the said cash surrender value, less the outstanding loan on said policy.

It is stipulated by the parties that on April 11, 1933, the date of the assured's death, the defendant mailed from its home office in Philadelphia, Penn., to its agent in the city of New York, for delivery to the assured, its check, payable to the order of the assured, in the sum of $78.66, representing the then cash surrender value of the policy. The defendant admits that it is unable to show whether said check was mailed prior to or after the death of the assured on said April 11, 1933, but it is conceded by the parties that it was

mailed to the company's agent in New York prior to the receipt of notice of the death of the assured by the company's home office in Philadelphia. Shortly after the death of the assured the defendant was advised that the surrender value of the policy would not be accepted, and for that reason no tender thereof was made to the legal representatives of the assured.

The plaintiff bases her claim to recover the full amount of the policy issued upon the life of her husband upon certain legislation enacted by the Legislature of the State of New York in 1933, being chapter 40 of the laws of that year, and which legislation and the rules and regulations promulgated by the Superintendent of Insurance thereunder the plaintiff asserts prevented the company from paying to the assured the cash surrender value of said policy and the acceptance of such cash surrender value by the assured. Pursuant to the authority conferred upon the Superintendent of Insurance of the State of New York by chapter 40 of the Laws of 1933, the Superintendent of Insurance, on March 9, 1933, adopted the following rules and regulations:

" Pursuant to the authority vested in me under Chapter 40 of the Laws of 1933, I, George S. Van Schaick, Superintendent of Insurance of the State of New York, hereby make the following rules and regulations imposing upon insurers transacting the business of life insurance conditions which are necessary and desirable to maintain sound methods of insurance and to safeguard the interests of policyholders, beneficiaries and the public generally during the present emergency.

" I. LOANS AND CASH SURRENDER VALUES.

" Until further order of the Superintendent of Insurance no life insurance corporation organized under the laws of the State of New York and no foreign corporation authorized to transact the business of life insurance in the State of New York shall as to any pending or future application under any life insurance policy or annuity contract issued in the United States, or in any territory or possession thereof, pay the cash surrender value of any such policy or contract or make any loan on the security of any such policy or contract, except as hereinafter provided;

" (a) *Loans.* Any such corporation may make a loan on any such policy or contract solely for the purpose of having such loan applied to the payment of any premium or any obligation of the policyholder, to such corporation.

" (b) *Cash Surrender Values.* Any such corporation may allow a cash surrender value for any such policy or contract solely for the purpose of having such cash surrender value applied to the payment of any premium or any obligation of the policyholder, to such corporation."

In said rules and regulations thus promulgated, the Superintendent made the following exception in cases of extreme need:

### " II. EXTREME NEED CASES.

"(a) *Ordinary Insurance.* Nothing hereinabove provided shall prevent any such corporation from allowing, in addition to the loan and cash surrender values provided for in paragraph I hereof, a cash surrender or loan value not in excess of One Hundred ($100.00) in the aggregate on all policies and contracts on the life of any one individual in any case of extreme need."

Thereafter the Superintendent of Insurance of the State of New York further amended the rules and regulations theretofore issued in several particulars, none of which seems to us pertinent to the controversy now before us.

Plaintiff claims that, at the time of the death of the assured, the policy was in full force and effect, and demands that, upon the foregoing facts, plaintiff have judgment against the defendant in the sum of $2,897.64, with interest thereon from April 11, 1933.

The defendant denies such alleged liability, and claims that the said policy was not in force at the time of the assured's death. The defendant claims that there was a surrender of the said policy by the assured, and demands judgment that the plaintiff recover of the defendant the sum of $78.66, with interest thereon from April 11, 1933.

The controversy, therefore, before us for decision is as to whether or not, upon the foregoing facts, the plaintiff is entitled to judgment in the amount claimed ($2,897.64), representing the face amount of the policy, less the outstanding loan thereon, or whether the plaintiff is entitled to judgment in the sum of $78.66 only, representing the surrender value of the policy at the time of the death of the assured, after deducting the amount of the outstanding loan on said policy.

We are of the opinion that the contention of the defendant must, in all respects, be upheld. Not only does the plaintiff concede that, under the terms of the policy, the insured was given the absolute right to surrender the policy at any time and to obtain the cash value of said policy upon executing a proper release and the delivery to the company of said policy, but it is further conceded by the plaintiff that, under the terms of the policy, its delivery to the defendant with a request on the part of the assured for its cash surrender value would have resulted in a surrender without any further steps on the part of the defendant. Unquestionably, such is the law in this State. (*Lofaro* v. *John Hancock Mut. Life Ins. Co.*, 239 App. Div. 54.) However, the plaintiff

contends that the insured lost his right to surrender his policy by reason of the rules and regulations adopted by the Superintendent of Insurance pursuant to the provisions of chapter 40 of the Laws of 1933. The plaintiff claims that the standing offer contained in the policy, acceptance of which by the insured would immediately have created a binding contract, was superseded and changed by such rules and regulations so that no contract arose between the parties as the result of the delivery of the policy to the defendant company, together with the duly executed cash surrender form furnished and issued by the company. The defendant relies upon the surrender of the policy and the delivery of such surrender form, and contends that thereby a binding contract arose between the parties, and, therefore, denies liability for the face value of the policy now claimed by the plaintiff.

We do not think chapter 40 of the Laws of 1933 and the rules and regulations adopted by the Superintendent of Insurance thereunder destroyed the contract between the parties. In our opinion, at most, such regulations adopted by the Superintendent of Insurance merely suspended the time of payment of the cash surrender value under the terms of the policy, which the assured had agreed to accept. The purpose of the act adopted by the Legislature in 1933 and the regulations of the Superintendent of Insurance in accordance therewith was, in our opinion, merely to suspend *payments* during the continuance of the emergency. We do not think there was any intention on the part of the Legislature to interfere with contract rights or obligations, but merely suspended the time of payment of the stipulated cash surrender value during the existing emergency. The purpose of chapter 40 of the Laws of 1933 was well expressed by section 1 of the act, as follows: "It is hereby declared that a public emergency exists affecting the health, comfort and safety of the people of the state, growing out of the abnormal disruption in economic and financial processes, the declaration of a banking holiday by this state and by other states, and by the federal government, the inability of insurers to carry on in a normal and ordinary manner the functions of their business owing to the situation now existing with reference to currency, specie, and checks, and other facts and circumstances curtailing and hampering the conduct of the business of insurance in a normal and ordinary manner."

The legislation was clearly for the purpose of protecting insurance companies from excessive and immediate demands on their resources. This is clearly shown by section 1, above quoted. The " abnormal disruption in economic and financial processes, the declaration

of a banking holiday * * *, and * * * the situation now existing with reference to currency, specie, and checks," made *payments* by the companies difficult and in many cases impossible. The money stringency and consequent run on banks and the anticipated similar run on the liquid assets of insurance companies were undoubtedly responsible for such legislation. The banking holiday itself prevented insurance companies from paying their obligations. In the preamble of the rules and regulations adopted by the Superintendent of Insurance pursuant to chapter 40 of the Laws of 1933 it was stated that "the following rules and regulations imposing upon insurers * * * conditions which are necessary and desirable to maintain sound methods of insurance and to safeguard the interests of policyholders, beneficiaries and the public generally during the present emergency." The rules and regulations adopted by the Superintendent go on to state: "Until further order of the Superintendent * * * no * * * corporation * * * shall as to any pending or future application under any life insurance policy or annuity contract * * * pay the cash surrender value of any such policy or contract or make any loan on the security of any such policy or contract, except as hereinafter provided."

It thus appears that under the rule as to loans and cash surrender values the *payment* of cash surrender values was suspended. We think the purpose of this legislation and of the regulations adopted by the Superintendent of Insurance pursuant thereto was solely for the purpose of temporarily suspending the duty of payment during the existence of the emergency. The suspension thus provided for in nowise changed the rights and obligations of the contracting parties. The only thing that was accomplished was the time of enforcement of the obligations under the policy. The regulations adopted by the Superintendent of Insurance and directly following the prohibition against payment of surrender values clearly indicate that the purpose of the regulations was solely to prevent policyholders from making immediate demand of payment upon insurance companies. In case of the demand of payment of large sums of money at a time when such payments would be difficult, if not impossible, the rules and regulations merely served to defer the time of payment. The rules adopted by the Superintendent of Insurance were first modified in two particulars, the first of which provided, as to loans, as follows:

"*Loans*. Any such corporation may make a loan on any such policy or contract solely for the purpose of having such loan applied to the payment of any premium or any obligation of the policyholder, to such corporation."

Manifestly, the making of a loan did not require the company to pay out cash. It served merely to reduce the amount that would be applied to the premium or other obligation. The second exception contained in the rules was with reference to cash surrender values, and provided as follows:

" *Cash Surrender Values.* Any such corporation may allow a cash surrender value for any such policy or contract solely for the purpose of having such cash surrender value applied to the payment of any premium or any obligation of the policyholder, to such corporation."

Clearly, the application of cash surrender values to premium payments or other obligations owed by the insured to the company would not involve the payment of cash, and, therefore, such payment of cash surrender values was not prohibited.

The rules further were relaxed in cases of extreme need by the following provision thereof:

## " II. Extreme Need Cases.

"(a) *Ordinary Insurance.* Nothing hereinabove provided shall prevent any such corporation from allowing * * * a cash surrender or loan value not in excess of One Hundred ($100.00) * * * on the life of any one individual in any case of extreme need."

The exception in extreme need cases of the cash surrender value or loan not in excess of $100 justified such exception. That at the time the assured requested the cash surrender value under his policy the assured was in "extreme need," clearly appears. On March 16, 1933, in requesting the payment to him of the cash surrender value upon delivery to the defendant of his policy, the assured wrote the defendant as follows:

" I am forced to surrender my insurance policy with your Company on account of being made a part to a separation suit instituted by my wife and I am order by Court to pay lawyers fees to the amount of $125.00.

" As the day of trial is approaching (and I have to have by that morning $62.50) I need sorely the money, otherwise I will be held in contempt of Court, and go to jail.

" My earnings are very low as I work on commission three days a week as barber.

" I am sure that you can do something for me, as I intend to take more insurance, as soon as I am through with this separation suit, and start life anew —."

In conformity with such request of the assured, the defendant company forwarded to him a form for the surrender of his policy

and demanding the cash surrender value, to be properly signed by the assured and two witnesses. This form was executed by the assured, under seal, in the presence of witnesses, in accordance with the requirements of the defendant insurance company, on March 29, 1933. In transmitting to the defendant this cash surrender form, duly executed by the assured, along with his policy, the assured wrote the defendant's New York representative as follows:

"Enclose you will find form, which was sent me in your letter of this morning, properly signed by me & two witnesses —

"I do sincerely trust that you will give this matter immediate attention on account of urgency and nearness of separation trial — I will never forget your & Mr. Pearlman courtesy and attention you have both shown me."

It very clearly appears, therefore, that there existed a case of extreme need on the part of the assured for the amount of the cash surrender value of the policy.

We are, therefore, of the opinion that chapter 40 of the Laws of 1933 and the regulations adopted by the Superintendent of Insurance thereunder merely served to suspend the duty of immediate payment so long as the existing financial crisis continued. We do not think the intent of the Legislature in enacting chapter 40 of the Laws of 1933 was to terminate or change the contractual obligations of the parties to the insurance contract. The duty to pay at once after the emergency passed was unaffected.

We are, therefore, of the opinion that the contention of the defendant upon this submission must be sustained, and that the plaintiff is entitled to judgment against the defendant only to the extent of the sum of $78.66, with interest thereon from April 11, 1933, representing the surrender value of the policy at the time of the death of the assured, after deducting the amount of the outstanding loan on said policy. Judgment is directed accordingly, without costs to either party as against the other.

FINCH, P. J., MARTIN, O'MALLEY and UNTERMYER, JJ., concur.

Judgment directed in favor of the plaintiff in the sum of $78.66, with interest thereon from April 11, 1933, without costs to either party as against the other. Settle order on notice.