## JACKSON v. UNITED BENEFIT LIFE INS. COMPANY

(No. 2081; February 7, 1939; 86 Pac. (2d) 1089)

64

For the respondent, there was a brief by *L. H. Sennett* and *Harris & Harris* of Casper, and oral argument by *Mrs. Laura B. Harris* and *Mr. Sennett.*

BLUME, Justice.

This is a suit on a life insurance policy by Belle Jackson, plaintiff, against the United Benefit Life Insurance Company, a corporation, with its home office at Omaha, Nebraska, and with a local office at Cheyenne, Wyoming. Plaintiff recovered judgment as prayed, and the insurance company above named has appealed. The facts, mostly contained in an agreed statement of facts, are, so far as material herein, as follows:

On August 26, 1932, the defendant insurance company, in consideration of the semi-annual payment of $17.72, issued to one Harry Jackson its policy No. C 78104 on the life of the insured in the sum of $2000. The beneficiary of the policy is the plaintiff and respondent herein. The semi-annual payments were due respectively on February 26 and August 26 of each

year. It is provided in the policy that premiums may be paid in advance in semi-annual or quarterly installments at the company's rates therefor, but that the payment of any premium or installment shall not maintain the policy in force beyond the date when the next premium or installment become payable. The policy further provides that "Upon default in payment of any premium this policy shall be null and void and all premiums forfeited to the company." 31 days of grace, however, were allowed, during which the policy was to remain in force.

At the same time at which the foregoing policy was written and delivered, the defendant herein furnished to insured an accident and health policy, No. LE3-9659, issued by the Mutual Benefit Health and Accident Association. The two policies were delivered in a single folder; premiums were collected as one item of $32.72 semi-annually. "While the billing of premiums on the two policies, as well as the payment, had always been treated as a single item, and the two policies were designated by a single number, yet each separate policy recited a separate consideration, the semi-annual premium on the life contract being $17.72, and on the health and accident contract $15." The premiums due up to and including August 26, 1933, were duly paid, but none thereafter except as herein mentioned. Prior to February 26, 1934, the company sent to the insured a written notice that a semi-annual premium of $32.72 would be due and payable on that date. Nothing, however, was paid on that date, but on March 23, 1934, the insured wrote a letter as follows:

"Newcastle, Wyoming, March 23, 1934

United Benefit Life Insurance Company,
Omaha, Nebraska.

Dear Sirs:

Please find money order for fifteen dollars ($15.00) for my payment on accident policy #LE3-9659. I'm

unable to carry both of the policies so I wish to drop Policy C-78104 and just carry the accident policy. Please mail receipt or advise as to whether this can be done or not.

Yours truly,
Harry Jackson."

The insured secured a money order for the sum of $15.00, payable to the United Benefit Life Insurance Company, and mailed the foregoing letter to the company at Cheyenne, instead of to Omaha, Nebraska. The money order and letter were received at that place by the company's manager. He indorsed and deposited the money order, and he applied it as shown by a letter written by him to the insured, which is as follows:

"March 28, 1934

Mr. Harry Jackson,
Newcastle, Wyoming.

Dear Mr. Jackson:
We received your money order for $15.00 today and wish to advise that it will be impossible for you to continue your present health and accident policy separate from your combination life, health and accident policy.

However, the quarterly premium on your combination policy is $16.53 or $32.72 on the semi-annual basis, which you no doubt have confused with the quarterly premium. The quarterly premium is $16.53, and as you have already sent us $15.00 if you will mail us an additional $1.53, we will be very glad, indeed, to mail you our receipt covering your combination life, health and accident for the next three months. We believe that by handling your premium on the quarterly basis, you will find it convenient to continue the entire contract in force.

We are enclosing a self-addressed envelope for your convenience and trust that we receive your remittance of $1.53 by return mail, at which time our official receipt will be mailed to you."

This letter was never answered, and no further cor-

respondence took place between the insured and the Cheyenne agent. A number of communications, however, were received by the insured from the company's office at Omaha. On March 24, 1934, the company wrote to the insured as follows:

"Mr. Harry Jackson,

Osage, Wyoming.

Dear Mr. Jackson:

We still do not have record of receiving remittance to cover your semi-annual premium. If this has not been taken care of, either by remittance direct to this office or with one of our representatives, your policy has reached the danger point, for you have only two more days of grace in which to meet payment.

It has just occurred to us, perhaps you are not prepared to conveniently meet the full six months' premium. If this is the case would suggest you change your policy over to the quarterly basis, for the time being at least. The attached change in Premium Mode Endorsement shows the quarterly rate.

If you will just return this, with the remittance shown, we will make the necessary changes for you,—this, of course, with the understanding you have the privilege of changing back to the semi-annual basis any time. This will cover you for the next three months by the best protection money can purchase."

Subsequently a notice, apparently on April 2, 1934, was sent from the office at Omaha, Nebraska, advising the insured that the premium on the foregoing policies had not been paid; that this was doubtless due to an oversight, and that for the convenience of the insured a form of reinstatement was enclosed, in order that he might apply for restoration; that if the application for such restoration were approved, his insurance would be restored; that otherwise his remittance, sent along with the application for reinstatement, would be returned. On April 10, 1934, another letter was written from the home office at Omaha, Nebraska, which is as follows:

"Mr. Harry Jackson,

Osage, Wyoming.

Dear Mr. Jackson:

The payment of the premium on your life insurance is a very important matter. I wish you would advise me why the premium has not been paid, as perhaps I can be of some help to you in the matter.

I am sure only some very unusual circumstance has hindered your remittance. With this thought in mind, we want to offer every possible assistance in reviving your policy to its original value, so you will not lose the premiums you have already paid in and forfeit the protection to yourself and beneficiary.

If you will forward your regular premium within ten days from date of this letter with the attached Health Certificate satisfactorily completed, I will personally see that the reinstatement of your policy is given immediate consideration without extra charge.

I hope it will be convenient for you to send your remittance within the ten day period. If not, please write me personally just what you are up against, giving me some idea when we can count on your remittance, and I will make the most satisfactory arrangements possible for you with our Premium Department."

A further letter was written from the home office at Omaha, Nebraska, on April 20, 1934, which is as follows:

"Mr. Harry Jackson,

Osage, Wyoming.

Dear Mr. Jackson:

I wonder if you would do me a favor?

I'd like your opinion on an important matter.

For some good reason or other you did not care to renew your policy. Would you be so good as to tell me why?

Not because I will then use 'Hammer and Tongs' to try to induce you to pay the premium, but because I just want to know where I fell down in getting you to keep this policy.

1. Was there anything unsatisfactory with your policy or our Service?............................

2. Did you feel the price more than you could afford?............................

3. If we could cut your policy down so as to reduce the price about 50% would you care to reinstate? ............................

It isn't necessary to write a letter. And if you prefer, just use a pencil in answering.

But regardless of how you do it, I want very much to hear from you and get your opinion. I assure you I would do as much for you.

A postage paid envelope is enclosed. Won't you please use it today?"

Nothing further appears to have been done until June 22, 1934, when the insured wrote to the company a letter as follows:

"United Benefit Life Insurance Co.,

Omaha, Nebraska.

Dear Sirs:

As I am unable to keep your policy in force and as I have mailed you a money order for fifteen dollars ($15.00) I wish you would mail this back to me. I would like to keep this policy in force, but as it is impossible for me to do so at this time please mail me a check for fifteen dollars ($15.00) by return mail.

Yours truly, Harry Jackson

This payment was made on policy #C78104."

In answer to the letter of June 22 above mentioned, the company answered as follows:

"June 29, 1934.

Mr. Harry Jackson,

Newcastle, Wyoming      Re: Policy C-78104

Dear Mr. Jackson:

It is regretted that adverse conditions will not enable you to apply for the reinstatement of your policy. We do not quite understand your request for a return of

the $15.00 for we do not have any evidence of receiving the money order to which you refer. We are wondering if you tendered the remittance direct to our Omaha office or if you mailed it to a Branch Office.

Will you kindly advise us in this respect, also giving the date of your payment in order that we may give the matter our further attention. For the convenience in replying promptly, a postage paid envelope is enclosed."

Upon receiving this letter, the insured, on July 2, wrote to the Insurance Company as follows:

"United Benefit Life Insurance Company,

Omaha, Nebraska.

Dear Sirs:

In reply to your letter of June 29 I wish to say that this was mailed in to the Cheyenne Office on March 26th. The money order #211668 was mailed in on payment of policy C-78104.

Yours truly,   Harry E. Jackson."

It is stipulated that if the manner of payment of the premiums had been changed to a quarterly basis, the next premium would have fallen due on May 26, 1934; by adding the 31 days of grace, on June 26, 1934. The $15.00 paid as above mentioned was not returned prior to the death of the insured, which occurred on July 10, 1934. Notice of his death was given in due time.

It may be noted here, in brief, that the insured, who had a life policy, as well as a health and accident policy, wanted, by his letter of March 23, 1934, to keep the health and accident policy in force and tendered to the Cheyenne agent of the insurance company the sum of $15 to do so. He wanted to drop his life policy. He was informed by the Cheyenne agent, by letter of March 28, 1934, that he could not keep the health and accident policy in force without the life policy. He subsequently demanded the return of the money. The company kept it till after the death of the insured on

July 10, 1934, which was not by accident. The trial court held that the company should have returned the $15 before the death of the insured, and not having done so, the life policy was in force and effect at that time, in accordance with the statement in 37 C. J. 536-37 as follows:

"It is a general rule that, where insurer with knowledge of facts entitling it to avoid or forfeit a policy, accepts or enforces payment of a premium, or retains a premium which it has received, it recognizes the continuing existence of the policy, and is precluded from asserting a forfeiture. This rule applies to the acceptance or retention of premiums for an unreasonable time."

The cases are unanimous, or at least substantially so, in upholding this rule, and we have no occasion now or disposition to question it. The attitude of this court in insurance cases has been foreshadowed in cases heretofore before us, and we should have been only too glad, if it had been possible for us to find the applicability of the foregoing statement of law in this case. Nevertheless, the facts in specific cases cannot be overlooked, and this court cannot take upon itself to make contracts for the parties, or change the conduct which they deliberately pursue. The controlling question herein is as to whether or not the insured paid any premium on the policy sued on herein which would keep the policy alive. Unless it can be said that the $15 paid by the insured can be construed to have been applied on the policy sued on herein, and was sufficient in amount to keep the policy in force up to and including the time of the death of the insured, the suit herein must fail and the judgment must be reversed. There must be some relation between money paid and the insurance policy which is the object of the suit. Merely because money or property comes into the hands of an insurance company by some means, accidental or otherwise, does not necessarily create lia-

bility on an insurance policy, although that might create the status of debtor or creditor. If the insured in this case had sent a rug or other personal property to the agent of the insurance company, it would hardly be contended that that would have any relation to the insurance policy in suit. In this case he sent money, but even then we cannot overlook the underlying thought already indicated. If an insured has but one insurance policy, and he sends money to the company, or to its duly authorized agent, without indicating the purpose to which it is to be applied, the presumption should, perhaps, obtain, that he meant it to be applied on the policy, and the retention of the money by the insurance company in such case should, perhaps, be construed as an application of the money thereon, for it is said in 48 C. J. 707 that "where there was only one indebtedness between the parties, it will be presumed that payments made were to apply thereon. * * * The general rule is that it will be presumed that a payment was intended to be applied, or was applied, in such manner as was just and proper at the time when the payment was made." But we know of no rule of law which permits an insurance company to apply money which comes into its hands contrary to the express direction (or perhaps later acquiescence) of the man who sends it. The insured had two policies, two different things on which to apply the money, or the situation was at least nearly that, even though the Cheyenne agent of the insurance company took the position that the two policies were to be treated as one, of the correctness of which we are not advised. But that would seem to be immaterial, or, in view of the facts, at least unimportant. The insured had at least two different items on which to apply the money which he sent, so that it would seem clear that the general rules relating to the application of payments are applicable here, or at least are the rules of law which

furnish a closer analogy for us than any other. That theory has been applied in at least three life insurance cases. Forrest v. Sovereign Camp, 220 Iowa 478, 261 N. W. 802; Burchard v. Western Traveler's Ass'n., 139 Mo. App. 606, 123 S. W. 973; Life Ins. Clearing Co. v. Altchuler, 55 Nebr. 341, 75 N. W. 862. It is said in 48 C. J. 642 that "payment will be applied as the debtor directs." In 48 C. J. 643, we find it stated that a "debtor paying money to his creditor has the primary and paramount right to direct the application of his money to such items or demands as he chooses." So we find in 48 C. J. 646 that "the application of the payments cannot be diverted without the consent of the debtor." In 21 R. C. L. 88 it is said:

"It is a well settled principle of both the civil and the common law, which is universally applied, that a debtor owing more than one debt to a creditor or a debt composed of several items has the right to direct to which debt or debts or to which item of a single debt and in what amounts a payment made by him shall be applied; and it is immaterial whether the debtor does or does not agree or consent to the debtor's request. The reason for this rule is that up to the time of payment the money is the property of the debtor, and being such may be applied as he sees fit. If a debtor does direct the application of a payment, the duty is thereby imposed on the creditor to apply the money as directed, or return it to the debtor; and if he fails to return it, it is regarded by law as having been applied as directed, no matter how the creditor in fact applied it."

The rule relied on by the trial court, above quoted, and sustained by numerous authorities found in the brief for the respondent herein, relates to the acceptance or retention of a *premium* which is paid on a specific policy. Money which may come into the hands of an insurance company is not necessarily a *premium* on a particular policy sued on, and unless it is such, the rule can have no application. We cannot conceive

how it is possible to construe the money paid in this case as a premium paid on the policy in suit. It was paid on the health and accident policy, which is not in question here. The letter of March 23, 1934, written by the insured to the Cheyenne agent, is specific on that point. It is almost as specific on the fact that it should not be paid on the life policy in suit, in view of the fact that the insured stated that he wished to drop the latter policy. This is enforced by the insured's letter of June 22, 1934, in which he asked for the return of the $15 paid. He thereby refused to accede to the proposition made to him by the Cheyenne agent to apply the money on the combination contract as a quarterly payment. In other words, he refused to make a payment of a premium on the policy in suit. None, therefore, can be construed to have been made, and hence the policy cannot be said to have been in force at the time of his death. None of the numerous authorities cited to us in respondent's brief bear any analogy to the facts in the case at bar. They are cases in which a *premium* on the policy in suit was accepted or retained, or where a premium on such policy was sought to be enforced. An extensive research on our own part has failed to disclose any case in which the beneficiaries under a policy have been permitted to recover under facts in any way similar to the facts in the case at bar. So far as we can find there is no other case like that at bar on record. McAllister, Adm'x. v. Life Ins. Co., 101 Mass. 558, 3 Am. Rep. 404; Traveler's Ins. Co. v. Jones (Tex. Civ. App.) 73 S. W. 978; Lockwood v. Life Ins. Co., 161 N. Y. S. 700; Lofaro v. Life Ins. Co., 239 App. Div. 54; Sibbo v. Life Ins. Co., 241 App. Div. 423, 272 N. Y. S. 374; Tucker v. Life Assur. Soc., 174 La. 508, 141 So. 71; Garner v. Life Ins. Co., 201 N. C. 716, 161 S. E. 308, cited to us, while containing some feature which appears in the case at bar, are on the whole totally dissimilar.

Counsel for the respondent, speaking of the letter of June 22, 1934, argue that "It is true also that Jackson apparently offered to cancel the policy and asked the company to return the $15, *which had been paid on the policy sued on*. Had the company availed itself of his offer, and returned his money by return mail, as requested by him, there would have been no suit. But the company failed to accept his offer, and upon his death the offer to cancel was revoked, and the rights of the parties became fixed. All parties agree that the status of the parties was fixed upon Jackson's death." There is in fact no question of offer to cancel and acceptance in the case. But aside from that, in order that the argument may have any force, it must necessarily be based on the premises that the company retained a premium paid on the policy in suit. And counsel in the foregoing statement assume that the $15 had been so paid. But, as we have seen, the assumption is not based on any fact, and the premises are not correct.

Counsel for respondent also argue that the letter from the Cheyenne agent dated March 28, 1934, and the subsequent letters and notices which were sent to the insured from the home office of the company at Omaha, show that the company recognized that the policy was in force and effect; that the company thereby "made every effort to collect the balance of the semi-annual premium;" that these acts of the company "constitute a waiver of the right to forfeit the contract on the part of the company, and that this right, having once been waived, cannot be revived." So far as any acts of the company, aside from the letter from the Cheyenne office, are concerned, they disclose nothing to indicate that the company considered the policy in force and effect, let alone considering it in force and effect till after the death of the insured. The letters and notice sent, each and all treat the policy as lapsed. An effort was made to cause the insured to apply for

reinstatement. But such efforts do not constitute a waiver of the default in the policy. Great American Life Ins. Co. v. Brown, 176 Okl. 500, 56 P. (2d) 809; Great Southern Life Ins. Co. v. Brooks, 166 Okl. 123, 26 P. (2d) 430. To hold otherwise would necessarily have a tendency to thwart the beneficent purposes of life insurance, since many policies would, doubtless, be dropped, were it not for the efforts of companies to keep them alive.

There is more force in the argument that the company, through the letter of March 28, 1934, written by the Cheyenne agent (assuming him to have authority, a point not argued herein and not decided) considered the policy in force and effect. In that letter that agent applied the $15 paid by the insured on the two policies heretofore mentioned, not as a semi-annual payment, but as a quarterly payment. The policy specifically provides that "premiums may be paid in advance in semi-annual or quarterly installments at the company's rates therefor," so that the further consent of the company for such quarterly payments was not necessary. The letter above mentioned was a sort of counter-offer to the insured. He had a right to accept it or reject it. It may be that if he had accepted it, or, perhaps, had merely acquiesced in it (21 R. C. L. 89; 48 C. J. 646, 647), the policy would have been in force and effect for the quarter ending in May, 1934, plus 31 days of grace, but we are unable to see how it could be held that it would have been in force any longer, for we know of no principle of law upon which the meaning of the counter-offer could be extended beyond its terms, and its meaning is clear. However, the insured by his letter of June 22, 1934, in which he asked for the return of the $15, impliedly refused to accept the counter-offer. So, too, counsel for plaintiff in this case contend that the counter-offer could have no effect without an express agreement between the parties and that no

such agreement was ever made. Hence the letter of the Cheyenne agent can in no event be of any benefit to the plaintiff herein.

In order that we may not be said to have overlooked any fact or argument herein, we may add one further observation. The insured in his letters of June 22 and July 2, 1934, stated that he paid the $15 on policy No. C-78104, which, strictly speaking, is the life policy in suit. If that had actually been true and insured had directed the company to apply it thereon, then, since, according to 21 R. C. L. 89, the payment would have been regarded as having been applied as directed, no matter how the company in fact applied it, the company, by an unconditional retention of the money, might, perhaps, have been liable under the rule of Inter-Southern Life Insurance Co. v. Omer, 238 Ky. 790, 38 S. W. (2d) 931, which holds that a partial payment, if accepted and applied, keeps the policy in force for a proportional period. But the rule of that case, if correct, cannot be applied here, since it is clear that the insured made no such application of money and gave no such direction. Nor did the company apply it under such direction. See Lamar v. Life Ins. Co., 85 F. (2d) 141, 143. The statement in the foregoing letters by the insured that he paid the money on policy No. C-78104 is simply not true, if he meant the life policy. The undisputed facts herein contradict it. The demand for the money back was consistent only with the theory that the company had not applied the money as he had directed; that is to say, only consistent with the theory that he refused to acquiesce in the application made of the money by the Cheyenne agent. The letter of July 2, 1934, does not, it is true, contain a demand for the return of the money. But it is clear that he wrote the letter so that his previous demand for the return of the money might be met promptly. He gave no indication whatever that such demand was

waived. But even if there was such waiver, and the letter of July 2, 1934, could be construed as a payment on the life policy, contrary to his previous direction, which we do not think is true, it could at most be construed only as a payment made thereon at that time, and in that event the company would have had a reasonable time from the receipt of that letter in which to return it. The letter was probably received about July 4th or 5th. The insured died on July 10, 1934. The intervening time of five or six days was not, we think, particularly under the circumstances in this case, unreasonable. Exchange Trust Company v. Life Insurance Co., 49 F. (2d) 133, 136.

The judgment of the trial court must, accordingly, be reversed, with direction to enter judgment for the defendant.

*Reversed.*

RINER, Ch. J., and KIMBALL, J., concur.